UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

MICHAEL ALAN GRAY, # 147217,      )
                                  )
                  Petitioner,     )      Case No. 1:07-cv-246
                                  )
v.                                )      Honorable Robert J. Jonker
                                  )
SHIRLEE A. HARRY,                 )
                                  )      **REPORT AND RECOMMENDATION**
                  Respondent.     )
_____ )

   This is a habeas corpus proceeding brought by a state prisoner under 28 U.S.C. § 2254. On September 10, 2001, petitioner entered a guilty plea in Kent County Circuit Court to the charge of second-degree murder, MICH. COMP. LAWS § 750.317, stemming from his participation in the July 3, 1982 robbery of William Cesar, in which Mr. Cesar was stabbed to death by petitioner's accomplice, Bumpy Nixon. Petitioner entered his plea pursuant to a plea agreement in which the prosecution agreed to drop first-degree and felony murder charges against petitioner and a supplemental information charging him as a habitual felony offender, fourth felony offense. Further, the prosecution agreed to a minimum sentence of 25 years' imprisonment. On October 30, 2001, Judge Donald A. Johnston sentenced petitioner to 25-to-75 years' imprisonment.

   On March 13, 2007, petitioner filed his federal habeas corpus petition. Petitioner is not attempting to disturb his plea-based second-degree murder conviction, but seeks to reduce the length of his sentence by arguing that his sentence should have started running years before he was

convicted. Further, petitioner requests a new state-court appeal. The three grounds raised by petitioner are as follows:

I.      Ineffective assistance of appellate counsel in filing an application for leave to appeal rather than an appeal as of right;

II.     Violation of his petitioner's Fourteenth Amendment rights under the Due Process Clause by "unnecessary delay" in charging him with murdering William Cesar and a violation of the Ex Post Facto Clause because he was not given "additional sentencing credit under the prevailing interpretation of the sentencing credit statute at the time of the offense;" and

III.    Violation of petitioner's rights under the Due Process Clause because "the presentence report does not accurately report petitioner's version of the offense."

Respondent has filed an answer (docket # 7), and the petition is ready for decision. Upon review, I find that all grounds raised by petitioner are devoid of substance, and I recommend that the petition be denied on its merits.

## **Proposed Findings of Fact**

### **A.      Trial Court Proceedings**

#### 1.      Preliminary Examination

In June 2001, petitioner received a preliminary examination in 61st District Court. (Preliminary Examination transcript (PE), docket #'s 11, 12). Among other things, the evidence showed that William Cesar's partially clothed body had been found lying face down in a parking lot. He was wearing a T-shirt, but was not wearing any pants, underwear, or shoes. Police found cowboy boots and a pair of pants in a pile about 25 feet from the victim's body. (PE, 43-45). The pockets of the pants were empty, and police did not find any wallet or other papers that would have assisted them in determining the victim's identity. (PE, 48). Petitioner did not dispute that the body police

found was that of William Cesar. (PE, 50). Petitioner stipulated to the admission of the autopsy report and the reports from the prosecution's DNA expert. (PE, 11-14). The victim had suffered multiple stab wounds into his left lung, and one of the major arteries in his neck had been cut. Cuts on the victim's hands, forearm and left thigh suggested that he had struggled with his assailant. The crime remained unsolved for a period of years. Authorities were ultimately led to petitioner in 1999, when petitioner's DNA was found to match that of the sperm found in the victim's rectum.

Kenny Summers testified that he had been involved in a relationship with petitioner, and that in 1982, they had shared a Grand Rapids, Michigan apartment. (PE, 58-60). Summers testified that petitioner returned to the apartment in the early morning hours of July 3, 1982. Petitioner had blood on his shirt and pants. (PE, 63). According to Summers, petitioner admitted that he had stabbed someone. (PE, 63). Summers described how petitioner disposed of his knife and bloody clothing and the victim's wallet. (PE, 71). Summers admitted that he had lied during his grand jury testimony and in various statements he gave to the police. (PE, 74-75). Summers admitted that he had been convicted of crimes involving theft or dishonesty "[s]omewhere between three and five times." (PE, 79-80). He testified that in July of 1982, he was using illegal drugs. (PE, 101). Suffice it to say that Mr. Summers's conduct and testimony provided fertile ground for cross-examination. The same was true for the prosecution's other witnesses: Edwin Daniels, who was serving a sentence on a conviction for obtaining money under false pretenses (PE, 130), and Rodney Scott, an inmate with a number of convictions for crimes involving theft or dishonesty. (PE, 160). Both men offered vague testimony about having heard petitioner confess that he had killed someone. (PE, 122, 127, 138, 152). Petitioner was bound over for trial in Kent County Circuit Court on all charges. (docket # 10).

2. <u>Guilty Plea</u>

On September 10, 2001, petitioner appeared before Judge Donald A. Johnston of the Kent County Circuit Court for the purpose of entering his guilty plea. (Guilty Plea Transcript (PT), docket # 13). In exchange for his plea, the prosecution agreed to dismiss the first-degree murder, felony murder, and the supplemental information charges against petitioner. The parties agreed to a minimum sentence of 25 years' imprisonment, and that if the court imposed a higher sentence, petitioner would be allowed to withdraw his guilty plea. Petitioner gave the following sworn testimony providing the factual basis for his second-degree murder conviction:

THE COURT: Mr. Gray, on July 3, 1982, were you at the rear of 413 Eastern Avenue, S.E, here in the City of Grand Rapids, Kent County, Michigan?

THE DEFENDANT: Yes.

THE COURT: And at that time did you and another man have something to do with a person named Billy Cesar?

THE DEFENDANT: Yes.

THE COURT: And the other man that was with you at that time, who has now died, who was that?

THE DEFENDANT: Bumpy Nixon.

THE COURT: I remember Bumpy Nixon. He was a rapist as I recall, who had a funny looking nose. Isn't that right?

THE DEFENDANT: Yes.

THE COURT: And he's died since then?

THE DEFENDANT: Yes.

THE COURT: Now, you and Mr. Nixon together, what, planned on robbing this Billy Cesar behind 413 Eastern?

THE DEFENDANT: Yes.

THE COURT: And you knew that Mr. Nixon was armed with a deadly weapon of some description?

THE DEFENDANT: Yeah.

THE COURT: What was it, a knife?

THE DEFENDANT: He had a knife.

THE COURT: And in going along with Mr. Nixon whom you knew to be a violent man, to commit this robbery of Mr. Cesar while Mr. Nixon had a knife, you were engaging in conduct that was creating a situation where there was a high likelihood of death or great bodily harm would occur; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: And, in fact, in the robbery of Mr. Cesar, things got rough, is that correct?

THE DEFENDANT: Yes.

THE COURT: And did Mr. Nixon stab him or in some way fatally injure him with the knife?

THE DEFENDANT: Yeah.  He stabbed him with the knife.

THE COURT: And you were right there at the time helping Mr. Nixon rob Mr. Cesar; is that right?

THE DEFENDANT: Yeah, prior -- prior to the stabbing, yes.

THE COURT: And, knowing that by participating in the robbery of Mr. Cesar with Mr. Nixon, who was armed with a knife, that this would very likely result in somebody's injury or even possibly death, you participated anyway, and indeed that is what happened; is that right?

THE DEFENDANT: Yes, it is.

THE COURT: So your mind set going into this was that you were willing to participate in the robbery, not necessarily specifically intending to kill Mr. Cesar, but realizing that your participation in the robbery with Mr. Nixon, who had a knife, was creating an atmosphere in which the injury or death of Mr. Cesar was certainly a very high probability; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: And your satisfied that it was a result of the knife wounds inflicted by Mr. Nixon that Mr. Cesar did, in fact, die?

THE DEFENDANT: Yes.

(PT, 10-13). Judge Johnston accepted petitioner's guilty plea and found him guilty of second-degree murder.

### 3. Sentencing

On October 30, 2001, Judge Johnston conducted a sentencing hearing. (Sentencing Hearing Transcript (SH), docket # 28). Petitioner did not object to the presentence report, but his attorney made a request that petitioner be permitted to submit to the court a more detailed statement describing his version of the events surrounding Mr. Cesar's death:

> Regarding the Presentence Report, Your Honor, I have received it. I have reviewed it. I have reviewed it with my client. There are no additions or corrections to make to it, with one exception.
>
> I would ask the Court note, in the offender's version of it, he gave a brief statement accepting responsibility and describing his remorse for his involvement in this.[1] What is not in the Presentence Report, however, and I would ask to include it either by way of oral argument or, if the Court would allow, I would prepare a brief typed statement.
>
> The Court might recall, at the time of the defendant's plea, he acknowledged his involvement in this crime as that he was a knowing and willing partner in the robbery of the decedent, knowing the potential danger to the decedent. But the gentleman by the name of Bumpy Nixon, who is now deceased himself in the State of Florida, is the one who actually caused the decedent's death. And he would like to have that clearly understood by the Court and made part of the Presentence Report.

---

[1] A copy of the presentence report is found in the Michigan Supreme Court record (docket # 17). On page 3, under the heading "Defendant's Version of the Offense," it states: "Mr. Gray gave the following statement at the time of his presentence interview: 'I'm sorry I was involved in this. I understand how the family feels and how devastating this was to them because I lost a sister to street crime since I've been locked up.'"

So my proposal would be is I just put a very brief synopsis of that together. I submit it to the Court and ask that it be attached to the Presentence Report.

THE COURT: I don't have any problem with a synopsis of the defendant's stated involvement in the crime as an addendum to the report. The exact role played by the defendant remains a bit murky and, of course, the DNA aspect of the case would suggest that the defendant may have been involved in anal sexual penetration of the victim. In fact, it not only convinces that he may have been, it establishes that he was. It would suggest that, whatever else happened, he was also involved in a form of sodomy contemporaneous with the murder.

Precisely who may have actually killed the victim is perhaps an open issue here. I have no problem with including the defendant's rendition.

(SH, 6-7). Immediately thereafter, the court gave petitioner an opportunity for allocution. Judge Johnston expressly invited petitioner to describe any circumstances that he wanted the court to consider before he imposed sentence. (SH, 7-8). Petitioner elected not to supply Judge Johnston with any further details regarding Mr. Cesar's murder, but instead made the statement quoted below:

THE COURT: Let me recognize you, Mr. Gray, and ask if there is anything you wish to say and whether there are any circumstances you believe the Court should consider in sentencing you?

MR. GRAY: Yes there is. I'd like to say to the Court and the victim's family that I am -- I apologize for even being involved in this, even though, as previously mentioned, I did not cause the victim's death or have anything to do with the victim's death.

I lost a loved on while I was incarcerated, so I know how the family feels. I know the pain. I know the absence, you know, the emptiness in a life now. I feel the same way, even when I think about my own sister who was murdered because of street crime.

I can only hope and pray that, one day in their heart, that they would forgive me for even being involved in this, regardless of whether I actually committed the murder or not. So, I only hope that they would truly, you know, make it known that I am forgiven. Thank you.

(SH, 6-7).

Judge Johnston was not impressed with petitioner's effort to distance himself from

William Cesar's murder:

> THE COURT: Very well. Thank you, Mr. Gray. My information is that on July 2nd of 1982, after leaving a party, the victim in this case was robbed, sodomized and fatally stabbed behind 413 Eastern, S.E.
>
> The crime remained unsolved for a lengthy period but, in 1999, the authorities began to do some DNA analysis on the sperm found in the victim's rectum, and that sperm was matched through DNA to you. Ultimately you were charged with the crime and entered your plea of guilty.
>
> You have acknowledged, as indicated by Mr. Stanley, that you participated in the robbery of the victim and indicated that, in the course of the robbery, your confederate, the notorious criminal Bumpy Nixon, actually killed the victim. Mr. Nixon was a person that I knew myself from years in the Prosecutor's office and my years on the bench, and he was a nefarious character, although, frankly, you appear to be a match for him in terms of your prior criminal performance.
>
> I note that, in 1971 as a juvenile, you were convicted of sodomy, arson, and murder of one Pedro Pesada (ph), then age 5, a crime which bears a certain resemblance to the crime in the case at bar.
>
> Since 1975, as an adult, you have been convicted of attempted larceny from a person, uttering and publishing, use of Pentazocine, assault with intent to commit murder, and armed robbery. Your currently doing lengthy prison sentences on the latter two convictions which occurred shortly after the homicide we are here to address.

(ST, 7-8).

Petitioner's plea agreement not only provided for a minimum sentence of 25 years,

it contained a provision that his sentence would run from the date the warrant for his arrest had been

issued: May 3, 2001. Petitioner's attorney's efforts to persuade Judge Johnston to give petitioner

a greater sentencing credit proved unsuccessful. He had filed a sentencing memorandum arguing

that the prosecution should have arrested petitioner at an earlier date, and therefore petitioner should

receive credit either from June 8, 1999, when the search warrant was issued to take a sample of

petitioner's blood, or alternatively, "from January 14, 2000 when the DNA match was discovered and when the police possessed all their core evidence." (Defendant's Memorandum Re: Sentencing Credit, found in Michigan Supreme Court Record, docket # 19). The legal authority cited in support of this argument was the *per curiam* decision of the Michigan Court of Appeals in *People v. Parshay*, 304 N.W.2d 593 (Mich. Ct. App. 1981). Defense counsel acknowledged that the Michigan Supreme Court's more recent decision in *People v. Prieskorn*, 381 N.W.2d 646 (Mich. 1985), had read the state's sentencing credit statute[2] far more narrowly than the "liberal construction" utilized by the Court of Appeals in *Parshay*. Judge Johnston held that the Michigan Supreme Court's decision in *Prieskorn* was the controlling legal authority, and he rejected defense counsel's argument:

> As indicated, the Guidelines are not applicable here, although the new guidelines, at least, would have provided for a 240 to 480 or a life sentence under the D-IV range. There is a specific sentencing agreement calling for a minimum 25 year term.

> The Prosecutor has authorized, as part of the agreement, credit for time you have served since the authorization of the warrant in the present case. The Court file discloses the warrant was authorized by Mr. Schieber -- looks like his sloppy signature in the authorization box -- on May 3rd of 2001. Detective Betz took the warrant to the district court and had it sworn to and issued on the 4th, and then you were apparently arraigned on the warrant on May 7th.

> Certainly the earliest of those dates, May 3rd, that's the date the warrant was authorized by the Prosecutor. It seems to me that's the earliest date from which sentence credit should be applied.

> The parties have briefed the issue and, while I understand your argument, Mr. Gray, saying that, as soon as the authorities concluded you were a likely suspect, you should begin

---

[2]The sentencing credit statute states: "Whenever any person is hereafter convicted of any crime within this state and has served any time in jail prior to sentencing because of being denied or unable to furnish bond for the offense of which he is convicted, the trial court in imposing sentence shall specifically grant credit against such sentence for such time served in jail prior to sentencing." MICH. COMP. LAWS § 769.11b.

getting credit from that time, there is no legal authority for that proposition. It seems to me the issue is controlled by MCL 769.11(B); MSA 28.1083(2); and the Michigan Supreme Court['s] decision in *People versus Prieskorn*, P-R-I-E-S-K-O-R-N, 424 Mich. 327 (1985).

(ST, 9-10). Judge Johnston advised petitioner of his right to seek appellate review. (ST, 11). On October 30, 2001, Judge Johnston entered his judgment sentencing petitioner to 25-to-75 years' imprisonment. (10/30/01 Judgment of Sentence Commitment to Department of Corrections, found in Michigan Court of Appeals Record, docket # 16). Consistent with the plea agreement, petitioner received credit for time served dating back to May 3, 2001. (*Id.*). Petitioner requested appointment of appellate counsel. On September 24, 2002, the court entered an order appointing Attorney Arthur H. Landau as petitioner's appellate counsel. (docket # 10).

4.     Motion for Resentencing

On October 23, 2002, Attorney Landau filed a motion for resentencing. (Motion for Resentencing and Brief in Support, found in Michigan Supreme Court Record, docket # 19). On November 8, 2002, Judge Johnston conducted a hearing on this motion. (Resentencing Hearing (RH), docket # 15). Appellate counsel, relying on the *Parshay* decision, argued that petitioner should have received credit against his sentence relating all the way back to "about" July 3, 1982, when William Cesar was murdered. Appellate counsel's theory was, with the benefit of hindsight, that police should have charged petitioner with Cesar's murder years earlier:

It is our contention, your Honor, that the Grand Rapids Police Department had several witnesses who would have testified as to defendant's involvement in this offense dating all the way back to 1982 from which they could have, with due diligence, prosecuted both Bumpy Nixon and defendant at that time. The police and prosecutor's office knew full well that defendant had been incarcerated in prison since 1983 out of a conviction out of Kent

County Circuit Court for another -- for an assault with intent to murder in which he received a 25 to 60 year sentence.[3]

Defendant -- it's defendant's contention that the police failed to exercise due diligence in the issuance of an arrest warrant and that the defendant must be given credit for the time served from the beginning of his incarceration on that separate offense, the assault with intent to murder, not merely from the date upon which the arrest warrant was issued in May of 2001.

The reason being that the pres -- that the police and the prosecutor's office knew full well that they had a legitimate, certainly, triable case against the defendant. They have all of these witnesses who would have testified as to admissions to them by defendant that he was involved in this robbery and murder, and that they failed to do so, obviously -- I shouldn't say obviously, but our contention is they failed to do so because they had defendant in prison on a separate offense and he wasn't going anywhere and they -- they took their time in -- in seeking an arrest warrant because defendant was incarcerated.

Had they exercised their obligation of due diligence the sentences in both of these cases would have run concurrently with one another since 1983 when he started his sentence on that separate case as well as in all probability being -- well, being arrested in this case and probably being convicted of some offense and the affect of the officer's lack of due diligence in prosecuting this case is that the defendant is now being forced to serve consecutive sentences rather than having the sentences run concurrently from the time the police have full knowledge of his involvement and should have prosecuted this case at -- at that time and the sentences should have been concurrent with one another.

In addition, it appears that the prosecutor's office had the defendant's DNA evidence as far back as July 1982 when defendant was a suspect and that they failed to go ahead and get the DNA tested.

(RH, 12-14). The prosecutor responded that in the late 1980s and early 1990s, DNA testing was in its infancy, and tests could only include or exclude a biological sample within four-to-ten percent of the population. This was a cold case, and the more sophisticated DNA testing available a decade later had solved it. The sample was sent to the laboratory in June 1999, and the report matching it

---

[3] Counsel's statement regarding the minimum sentence was inaccurate. Petitioner's minimum sentence on his 1984 conviction for assault with intent to murder was 35 years' imprisonment.

with petitioner's DNA had not been completed until January 2000. The prosecutor sought an arrest warrant on May 3, 2001. (RH, 15, 26).

Judge Johnston questioned petitioner's appellate counsel where the obligation to exercise due diligence in prosecuting petitioner came from, because "The words don't appear anywhere in the statute, 769.11b." (RH, 18). Counsel responded by citing the *Parshay* decision. In *Parshay*, Detroit police had received a criminal sexual conduct complaint against Fred Parshay on February 25, 1977. On March 1, 1977, Parshay was incarcerated in the Oakland County jail on an unrelated charge. Five months later, on August 8, 1977, a warrant was issued for Mr. Parshay's arrest. 304 N.W.2d at 594. The Michigan Court of Appeals began its decision by flatly rejecting Parshay's argument that his due process rights had been violated by the delay occurring between the time the police received the complaint and the filing of the arrest warrant. 304 N.W.2d 594 (citing *United States v. Lovasco*, 431 U.S. 783, 790-96 (1977) (holding that a criminal defendant does not have any constitutional right to have criminal charges filed against him as soon as the government has sufficient evidence to prove his guilt beyond a reasonable doubt). Further, the Court of Appeals held that the defendant had waived his speedy trial claim when he entered his unconditional guilty plea. *Id.* at 594. Then, under the guise of a liberal construction of Michigan's sentencing credit statute, MICH. COMP. LAWS § 769.11b, the panel announced what it labeled as a state-law "due diligence" rule for police:

> Officer Friday's explanation for failing to act quicker in her search for Lee [a res gestae witness] was that she had a heavy case load, a week of night duty, and possibly some vacation time. In our opinion, a liberal and reasonable construction of the credit statute would require the police to act with due diligence in pursuing their investigation prior to the issuance of a warrant. What constitutes "due diligence" should be considered in the same light as a prosecutor's duty to exercise due diligence in securing a witness for trial. Where the police have failed to live up to this standard and delay in the issuance of an arrest warrant

is the result, if the defendant is incarcerated on another offense, unless that other offense precludes concurrent sentencing, we believe defendant must be given credit from the beginning of his incarceration and not just the date upon which the arrest warrant was issued.

304 N.W.2d at 595 (citations omitted).

Judge Johnston was not persuaded by the factual or legal foundation of petitioner's counsel's argument. Judge Johnston found that the witnesses who had advised police of petitioner's role in killing William Cesar were a group of "criminally disposed nefarious characters who ha[d] proven unreliable in the past and whose credibility would be ripped up readily if they were to appear in open court and that was the only basis of the charge." (RH, 34). Scientific advancements in DNA testing had eventually provided the prosecution with an "ironclad case" against petitioner. (*Id.*). Petitioner had already received, under the terms of his plea bargain, "credit against the sentence for all the time subsequent to the issuance of the warrant by the prosecuting attorney charging the [petitioner] with this particular crime." (*Id.*). Judge Johnston found that the sentencing aspect of the *Parshay* decision was "pretty much a dead letter." (*Id.* at 33). Michigan's sentencing credit statute was not being "liberally construed" in *Parshay*, but was actually "substantially amending the statute and actually twisting it to apply to a situation where on its face it plainly [did]n't apply. The statute does not address the situation we're talking about here[,] nor [did] it address the situation the Court of Appeals was confronted with in *Parshay*." (RH, 31-32). Judge Johnston observed that, "*Parshay* has, apparently, been generally disregarded by subsequent panels of the Court of Appeals and the Michigan Supreme Court [h]as indicated disapproval of that particular approach to construing the statute." (RH, 32). The Michigan Supreme Court's decision in *People v. Prieskorn*, 381 N.W.2d 646 (Mich. 1985), soundly criticized the Court of Appeals for its series of cases where it purported to give "liberal construction" to the State's sentencing credit statute rather than paying

attention to its express terms. 381 N.W. 2d at 647-52. Michigan courts must work with the text of

the statute as it is written. *Id.* Judge Johnston noted that the post-*Prieskorn* decisions of the Court

of Appeals had not followed *Parshay*. (RH, 33) (citing *People v. Sickles*, 412 N.W.2d 734 (Mich.

Ct. App. 1987)). On December 2, 2002, Judge Johnston entered his order denying petitioner's

motion for resentencing. Further, his order stated, "defendant may prepare a short rendition of his

version of events, which shall be attached to the presentence report and forwarded to the Department

of Corrections as part of the presentence report."[4] (12/2/02 Order, docket # 19).

### B.    Appellate Proceedings

On November 27, 2002, through Attorney Landau, petitioner filed an application for

leave to appeal to the Michigan Court of Appeals and raised the following issue:

> DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN FAILING TO GIVE
> DEFENDANT CREDIT AGAINST HIS SENTENCE FOR ALL TIME SERVED, WHERE
> THE POLICE AND PROSECUTOR FAILED TO EXERCISE DUE DILIGENCE AND
> VIOLATED DEFENDANT'S DUE PROCESS RIGHTS, RESULTING IN A LENGTHY
> DELAY IN THE ISSUANCE OF AN ARREST WARRANT WHILE DEFENDANT WAS
> CONTINUOUSLY INCARCERATED ON ANOTHER OFFENSE INVOLVING
> CONCURRENT SENTENCING, THEREBY REQUIRING RESENTENCING.

(Statement of Issue Involved, Defendant-Appellant's Brief at vii, found in Michigan Court of

Appeals Record, docket # 16). On March 3, 2003, the Michigan Court of Appeals denied

petitioner's appeal "for lack of merit in the grounds presented." (3/3/03 Order, docket # 16).[5]

---

[4]It does not appear that petitioner availed himself of the opportunity authorized by Judge
Johnston's order. The circuit court's docket sheet (docket # 10) does not contain an entry for
petitioner's supplement to the presentence report.

[5] The Court of Appeals denied petitioner's motion to add additional grounds. (2/6/03 Order,
docket # 16).

Petitioner's April 2003 delayed application for leave to appeal to Michigan's highest court raised the same issue rejected by the Michigan Court of Appeals. Petitioner also raised four other issues in which he claimed the right to supplement the presentence report, greater credit against his 25-to-75 year sentence, and the right to another appeal. (4/28/03 Delayed Application for Leave to Appeal, copy attached to the petition). On August 29, 2003, the Michigan Supreme Court entered an order denying petitioner's request for review, stating, "we are not persuaded that the questions presented should be reviewed by this Court." (8/29/03 Order, docket # 17).

### C.     Motion for Post-Conviction Relief and Applications for Appellate Review

On May 25, 2004, petitioner filed his motion in Kent County Circuit Court for post-conviction relief under Rule 6.500 of the Michigan Court Rules. The three issues raised by petitioner were: (1) the presentence report should be amended to reflect petitioner's version of the murder of William Cesar and to note petitioner's "accomplishments while incarcerated" and that the court should order the Michigan Department of Corrections to destroy all copies of the October 6, 2001 presentence report and distribute a corrected presentence report; (2) ineffective assistance of appellate counsel in filing an application for leave to appeal to the Michigan Court of Appeals rather than an appal as of right; and (3) "the [S]tate violated [petitioner's] rights under *People v. Parshay* and his due process right to speedy prosecution" and "the Due Process Clause of the Fourteenth Amendment requires the Court to follow the law in effect at the time of the offense and award credit for time served beginning on January 1, 1990." (Motion for Post-conviction Relief, copy attached to petition, docket # 1). Petitioner argued that the presentence report should be amended to include this statement as his version of events:

I was driving on Division Avenue and saw Bumpy Nixon. I stopped and picked him up. As we were riding, Bumpy said he needed some money and was looking for someone to rob. I stopped at a party store on Wealthy and Union to buy a beer. As I was coming out of the store, I saw William Cesar. We had been together earlier that night. William asked for a ride from Wealthy to Eastern, where he was going to meet someone. I agreed. He got in the front passenger side, Bumpy was in the back, and I was driving. When we got to Wealthy and Eastern, I parked in the parking lot of Johnnie's Shoe Repair and the three of us smoked some marijuana. William said he had to use the bathroom, left the car, and went behind it. A minute later, Bumpy said he was going to rob William and got out of the car. I heard a scuffle behind the car. I tried to get out but my driver's door was jammed. I scooted across the front seat and got out the passenger door. By the time I reached the back of the car, William was on the ground. Bumpy said he had stabbed him. I went to see if William was all right. It looked like William was dead; he was not breathing or moving. I got back in the car, started it up, and left Bumpy behind. I do not know if I could have done anything to help, but I will always regret that I did not try to stop Bumpy before he stabbed William or try to help William instead of leaving.

(*Id.* at 4).

On July 20, 2004, Judge Johnston entered an order denying petitioner's motion in part and granting it in part:

ON ORDER OF THE COURT the motion by the above-named defendant, MICHAEL ALAN GRAY, acting in pro per for relief from judgment is CONSIDERED, and pursuant to MCR 6.504(B)(2), the same is hereby DENIED to the extent that it seeks to re-present arguments disposed of by this Court's prior order of December 2, 2002, which order the Court expressly reaffirms; and

To the extent that defendant's present motion seeks additions or changes to the presentence report that were not raised at or before sentencing pursuant to MCR 6.429(C), the same is hereby DENIED; and

To the extent that defendant's present motion seeks appointment of counsel to pursue further post-conviction remedies on his behalf, the same is hereby GRANTED, and the appointments clerk of this court is directed to make the appropriate appointment.

(7/20/04 Order, copy found in Michigan Court of Appeals record, docket # 18).

On July 22, 2005, Attorney Jacqueline J. McCann of the State Appellate Defender Office filed a delayed application for leave to appeal which raised these issues:

I.      WERE DEFENDANT'S STATE CONSTITUTIONAL RIGHT TO AN APPEAL, STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS, AND STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL VIOLATED, WHERE THE CIRCUIT COURT FAILED TO INFORM DEFENDANT OF HIS APPELLATE RIGHTS AND LATER, WHEN DEFENDANT LEARNED HIS RIGHTS AND ASKED TO APPEAL BY RIGHT, FAILED TO ENTER A CLAIM OF APPEAL ON HIS BEHALF AND WHERE APPELLATE COUNSEL FAILED TO SEEK ENTRY OF A CLAIM OF APPEAL? IS THE PROPER REMEDY TO GIVE DEFENDANT THE DIRECT APPEAL OF RIGHT TO THIS COURT WHICH HE SHOULD HAVE BEEN GIVEN ORIGINALLY?

II.     IS THE DEFENDANT ENTITLED TO ADDITIONAL SENTENCING CREDIT WHERE THE GOVERNMENT VIOLATED HIS STATE AND FEDERAL DUE PROCESS RIGHTS BY THE UNNECESSARY DELAY IN CHARGING HIM UNDER THE PREVAILING INTERPRETATION OF THE SENTENCING STATUTE AT THE TIME OF THE OFFENSE?

III.    SHOULD THIS COURT DIRECT THE CIRCUIT COURT TO COMPEL THE PROBATION OFFICE/DEPARTMENT OF CORRECTIONS TO ENFORCE ITS EARLIER ORDERS TO SUPPLEMENT THE PRESENTENCE REPORT WITH THE DEFENDANT'S VERSION OF THE OFFENSE?

(Defendant-Appellant's Delayed Application for Leave to Appeal at v, docket # 18). On February 3, 2006, the Michigan Court of Appeals entered an order denying petitioner's application for leave to appeal "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." (3/2/06 Order, docket # 18). Petitioner sought review of the same issues by the State's highest court. On August 29, 2006, the Michigan Supreme Court entered its order denying petitioner's application for leave to appeal because he "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." (8/29/06 Order, docket # 19).

Petitioner sought review of two issues by the United States Supreme Court: (1) whether the denial of his appeal as of right violated his rights under the Fourteenth Amendment's Due Process Clause; and (2) whether appellate counsel's failure to file a claim of appeal constituted

ineffective assistance of counsel. (Petition for a Writ of Certiorari, copy attached to petition, docket # 1). On February 20, 2007, the Supreme Court denied the petition for a writ of *certiorari*. Petitioner filed his federal habeas corpus petition in this court on March 13, 2007.

## Applicable Standard

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir. 2008). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Wilkins v. Timmerman-Cooper*, 512 F.3d 768, 774 (6th Cir. 2008). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) ("'[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.") (quoting 28 U.S.C. § 2254(d)).

Even if a state court disposes of a constitutional claim without articulating its analysis, deferential review is required. The Sixth Circuit describes the review AEDPA requires under such circumstances as "modified AEDPA deference." *Vasquez v. Jones*, 496 F.3d 564, 569-70

-18-

(6th Cir. 2007); *see Cornwell v. Bradshaw*, 559 F.3d 398, 412-13 (6th Cir. 2009); *Howard v. Bouchard*, 405 F.3d 459, 467 (6th Cir. 2005). Under the modified standard, "a federal habeas court must conduct an independent review of the record and applicable law to determine whether, under the AEDPA standard, the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. The independent review, however, is not a full *de novo* review of the claims. As we held in *Harris* [*v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000)], this standard of review requires the court to conduct a careful review of the record and applicable law, but nonetheless, bars the court from reversing unless the state court's decision is contrary to or an unreasonable application of federal law." *Howard*, 405 F.3d at 467-68; *see Hawkins v. Coyle*, 547 F.3d 540, 546 (6th Cir. 2008). "In other words, we must focus on the result of the state court's decision, applying AEDPA deference to the result reached, not the reasoning used." *Irick v. Bell*, 565 F.3d 315, 320 (6th Cir. 2009).

*De novo* review is restricted to instances where the state court did not address the merits of a claim. In that limited set of circumstances, "there are simply no results, let alone reasoning, to which [the habeas] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Van v. Jones*, 475 F.3d 292, 293 (6th Cir. 2009); *Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005).

The AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). Section 2254(d) states that an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that

was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning. A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than the [Supreme Court] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 694 (citations omitted). A federal court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

"It is important to note, however, that 'an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law.'" *Harbison v. Bell*, 408 F.3d 823, 829 (6th Cir. 2005) (quoting *Williams*, 529 U.S. at 409); *Waddington*, 129 S. Ct. at 831; *Fleming v. Metrish*, 556 F.3d 520 (6th Cir. 2009). "The question under AEDPA is not 'whether a federal court believes that state court's determination was incorrect but whether that determination was unreasonable -- a substantially higher threshold.'" *Holder v. Palmer*, 588 F.3d 328, 337-38 (6th Cir. 2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). A federal habeas court may not

find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *see Walls v. Kontech*, 490 F.3d 432, 436 (6th Cir. 2007). Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410; *see Bell v. Cone*, 535 U.S. at 694; *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006) ("The proper inquiry under the 'unreasonable application' analysis is whether the state court decision was objectively unreasonable and not simply erroneous or incorrect."); *Payne v. Bell*, 418 F.3d 644, 653 (6th Cir. 2005)("A state court decision involves an 'unreasonable application' of clearly established Supreme Court precedent when it correctly identifies the governing legal standard but applies it to the facts before it in an objectively unreasonable manner.") (citations omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. at 412; *Wilson v. Parker*, 515 F.3d at 691; *Ross v. Petro*, 515 F.3d 653, 660 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 906 (2009). This court may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *See Williams*, 529 U.S. at 381 ("If this Court has not broken sufficient legal ground to establish an asked for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."); *see also Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419 (2009).

The AEDPA standard includes an important temporal limitation. "'[C]learly established Federal law as determined by the Supreme Court of the United States,' refers to 'the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Dennis v. Mitchell*, 354 F.3d 511, 517 (6th Cir. 2003) (quoting *Williams*, 529 U.S. at 412); *see Fautenberry v. Mitchell*, 515 F.3d 614, 623 (6th Cir. 2008). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004) (describing the issue of whether the law was clearly established by Supreme Court precedent as a "threshold inquiry"). "'Federal Courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.'" *Payne*, 418 F.3d at 656 (quoting *Cone v. Bell*, 543 U.S. at 455). "The state court decision need not cite Supreme Court precedent, or even reflect awareness of Supreme Court cases, 'so long as neither the reasoning nor the result of the state court decision contradicts them.'" *Dennis*, 354 F.3d at 517-18 (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)).

Regardless of the subsection of 2254(d) relied on by the petitioner, AEDPA requires heightened respect for state factual findings. 28 U.S.C. § 2254(e)(1); *see Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Jaradat v. Williams*, 591 F.3d 863, 864-65 (6th Cir. 2010); *Mills v. Cason*, 572 F.3d 246, 250 (6th Cir. 2009). This presumption of correctness is accorded to findings

of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Tucker v. Palmer*, 541 F.3d 652, 665 (6th Cir. 2008), *cert. denied*, 130 S. Ct. 109 (2009).

## Discussion

### I. Ineffective Assistance of Appellate Counsel

In Ground I, petitioner argues that he is entitled to a new appeal because his appellate counsel filed an application for leave to appeal rather than an appeal as of right. Claims of ineffective assistance of appellate counsel are measured under the standards established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). *See Evitts v. Lucey*, 469 U.S. 387 (1985). Petitioner must prove (1) that appellate counsel's performance fell below an objective standard of reasonableness and (2) that counsel's deficient performance prejudiced defendant resulting in an unreliable or fundamentally unfair outcome. 466 U.S. at 687-88. Respondent has not disputed that petitioner was entitled to an appeal as of right. (Answer, at 5, docket # 7) ("[I]t would appear Petitioner was entitled to an appeal as of right because, although he was sentenced on October 30, 2001, the underlying crime occurred *before* Michigan eliminated appeals of right for guilty pleas."). *See People v. Kaczmerek*, 628 N.W.2d 484, 486-87 (Mich. 2001). For analytical purposes, I will assume that appellate counsel's decision to file an application for leave to appeal rather than an appeal as of right satisfied the first prong of the *Strickland* standard.

Petitioner cannot possibly satisfy *Strickland*'s prejudice prong. This prong focuses on whether "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair," *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), and "[t]he defendant must show there is a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Petitioner does not approach satisfying this demanding standard.

Petitioner argues that because his appeal was conducted through the application for leave to appeal process rather than by the appeal as of right process, his "challenge to the accuracy of his presentence report and [] dispute about when his sentence should begin to run -- [were] never [ ] decided by an appellate court." (Pet. Brief at 5-6). This is not true on petitioner's due-process claim with regard to his sentence. Petitioner's appellate counsel argued that under the Due Process Clause, petitioner was entitled to have his sentence start to run before May 3, 2001.[6] The Michigan Court of Appeals denied petitioner's appeal "for lack of merit in the grounds presented." (3/3/03 Order, docket # 16). Petitioner received an appellate review of the issues raised by his appellate counsel. Further, as is shown in greater detail in sections II and III, petitioner's challenges to his sentence and the presentence report are meritless. Appellate counsel is not required to raise meritless claims and petitioner cannot suffer prejudice from counsel's failure to raise meritless claims. *See Evans v. Hudson*, 575 F.3d 560, 566 (6th Cir. 2009).

## II.    Sentence

In Ground II, petitioner argues that his rights were violated by delay in charging him with William Cesar's murder. Petitioner has not presented clear and convincing evidence to overcome the state court findings rejecting his claims of delay by the prosecutor or police. 28 U.S.C.

---

[6]Review of an application for leave to appeal by the Michigan Court of Appeals, like an appeal as of right, entails an evaluation of the merits of the applicant's claims and error correction. *See Halbert v. Michigan*, 545 U.S. 615, 617 (2005). "[T]he difference between the two appellate avenues do not establish that petitioner received less than what [he] was constitutionally guaranteed." *Perks v. Vasbinder*, No. 05-cv-72657, 2006 WL 2594470, at * 9 (E.D. Mich. Sept. 8, 2006) (collecting cases).

§ 2254(e)(1). Judge Johnston found that the witnesses who had advised police of petitioner's role

in killing Mr. Cesar were a group of "criminally disposed nefarious characters who ha[d] proven

unreliable in the past and whose credibility would be ripped up readily if they were to appear in open

court  and that was the only basis of the charge."  (RH, 34).  It was the subsequent scientific

advancements in DNA testing which eventually provided the prosecution with its "ironclad case"

against petitioner.  (*Id.*).

Petitioner's reliance on the decision of the Michigan Court of Appeals in *Parshay* is

misplaced.  *Parshay* was decided on state-law grounds -- specifically, an extraordinarily strained

interpretation of the Michigan sentencing credit statute which the Michigan Supreme Court rejected.

Habeas relief is available only on the ground that a petitioner is being held in custody in violation

of the federal Constitution or laws.  28 U.S.C. § 2254(a).  A habeas court cannot release a state

prisoner on the ground that the conviction or sentence violates state law.  *See Estelle v. McGuire*,

502 U.S. at 67.

The Michigan Court of Appeals rejected petitioner's due process claim "for lack of

merit."  This decision is entitled to "modified AEDPA deference," but even under a *de novo* review,

the result would be the same.  In *United States v. Lovasco*, 431 U.S. 783 (1977), the Supreme Court

held that a criminal defendant does not have any constitutional right to have charges filed against

him as soon as the government has sufficient evidence to prove his guilt beyond a reasonable doubt.[7]

---

[7]Petitioner attempt to inject claims that his right to a "speedy prosecution" under "Michigan
and federal case law" (Pet. Brief at 15) cannot be countenanced.  Federal habeas corpus relief is not
available for alleged violations of state law, 28 U.S.C. § 2254(a), and petitioner's unconditional
guilty plea waived any claim he may have had regarding the speed at which he was brought to trial.
*See Tollett v. Henderson*, 411 U.S. 258, 267 (1973).

There is no Supreme Court precedent that would entitle petitioner to have his sentence begin to run at any time before May 3, 2001.

Petitioner's claim that he is entitled to additional sentencing credit under an Ex Post Facto Clause analysis was not raised by his appellate counsel, and it is expressly given *de novo* consideration here. The Ex Post Facto Clause, U.S. CONST. art. I, § 10, cl. 3, states that "[n]o State shall . . . pass any . . . ex post facto law." "It is a 'limitation of the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government.'" *Rogers v. Tennessee*, 532 U.S. 451, 456 (2001) (quoting *Marks v. United States*, 430 U.S. 188 (1977)). "'[A]ny statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to the law at the time when the act was committed, is prohibited as *ex post facto*.'" *Collins v. Youngblood*, 497 U.S. 37 (1990) (quoting *Beazell v. Ohio*, 269 U.S. 167, 169-70 (1925)). William Cesar was killed on July 3, 1982, and petitioner pleaded guilty to the charge of second-degree murder. On July 3, 1982, the criminal punishment in Michigan for second-degree murder was, and it remains, "imprisonment in the state prison for life, or any term of years." MICH. COMP. LAWS § 750.317. Petitioner was sentenced within these statutory limitations.

The Supreme Court has observed that "limitations on *ex post facto* judicial decisionmaking are inherent in the notion of due process." *Rogers*, 532 U.S. at 456. However, "petitioner is mistaken to suggest that these considerations compel extending the strictures of the Ex Post Facto Clause to the context of common law judging. The Ex Post Facto Clause, by its own terms, does not apply to courts. Extending the Clause to courts through the rubric of due process

would circumvent the clear constitutional text. It would evince too little regard for the important institutional and contextual differences between legislating, on the one hand, and common law decisionmaking, on the other." *Rogers*, 532 U.S. at 460. It would "place an unworkable and unacceptable restraint on normal judicial processes and would be incompatible with the resolution of uncertainty that marks any evolving legal system." *Id.* at 461.

Petitioner argues that he is entitled to and award of "credit for time served beginning on January 1, 1990," because the *Parshay* decision was the controlling state-law authority in July 1982, when Mr. Cesar was murdered. (Pet. Brief at 10-15). Among other things, this argument ignores the plain language of the statute,[8] the fact that *Parshay* was not decided on analogous facts, and that the Michigan Court of Appeals had issued other conflicting decisions regarding the sentence credit statute.[9] More importantly, for present purposes, no federal court has given an "interpretation" of a statute by a state's intermediate appellate court the type of weight petitioner claims the *Parshay* decision is entitled to under *ex post facto*-type due process considerations. It can hardly be deemed "unexpected and indefensible" when a state's supreme court demands that lower appellate courts pay attention to the express terms of a statute. *Rogers*, 532 U.S. at 461-62; *see Prieskorn*, 381 N.W.2d

---

[8]Before Michigan enacted its sentencing credit statute in 1966, criminal defendants in Michigan were not entitled to any credit against their sentence for the time they were held in jail before being sentenced. *See Bowen v. Recorder's Court Judge*, 179 N.W.2d 377 (Mich. 1970). The sentencing credit statute states, "Whenever any person is hereafter convicted of any crime within this state and has served any time in jail prior to sentencing because of being denied or unable to furnish bond for the offense of which he is convicted, the trial court in imposing sentence shall specifically grant credit against the sentence for such time served in jail prior to sentencing." MICH. COMP. LAWS § 769.11b. Petitioner was not serving time in jail "because he was denied or unable to furnish bond" for the second-degree murder "offense of which was convicted." He was in prison on his convictions for committing other felonies.

[9]*See, e.g., People v. Monasterski*, 307 N.W.2d 394, 401(Mich. Ct. App. 1981); *People v. Tilliard*, 296 N.W.2d 180, 182 (Mich. Ct. App. 1980).

at 649-52.  Applying the Michigan Supreme Court's decision in *Prieskorn* did not violate petitioner's constitutional rights, and petitioner is not entitled to have his sentence start to run on any date other than that specified in the Judgment of Sentence Commitment to the Michigan Department of Corrections.

### III.    Presentence Report

In Ground III, petitioner argues that his rights under the Fourteenth Amendment's Due Process Clause were violated because his presentence report does not currently include a supplement regarding his version of events.  This argument is frivolous.  The Constitution does not guarantee petitioner a right to supplement his presentence report.  It certainly does not guarantee him a platform for attempting to impress the parole board with a list of his accomplishments as a state prisoner.[10]  (Pet. Brief at 19-21).  Petitioner was twice granted leave to file a brief statement regarding his version of the sequence of events resulting in Mr. Cesar's murder, and he has not yet availed himself of that opportunity.  Judge Johnston was well aware at the time of sentencing that petitioner claimed he did not stab Mr. Cesar and that petitioner blamed the stabbing on the late Bumpy Nixon.  Petitioner was not sentenced on the basis of materially false information.  *See Townsend v. Burke*, 334 U.S. 736 (1948); *accord Stewart v. Erwin*, 503 F.3d 488, 494-98 (6th Cir. 2007).  The statement petitioner included within the body of his motion for post-conviction relief in which petitioner attempted to further distance himself from Mr. Cesar's murder did not persuade Judge Johnston to modify petitioner's sentence.  The sentencing transcript makes pellucid that

---

[10]Michigan prisoners have no constitutionally protected liberty interest in parole.  *See Foster v. Booker*, __ F.3d __, 2010 WL 546495, at * 12-13 (6th Cir. Feb. 18, 2010).

petitioner had a more than adequate opportunity for allocution explaining his version of events to

Judge Johnston before sentence was imposed.

## **Recommended Disposition**

For the foregoing reasons, I recommend that the petition be denied.


Dated: March 2, 2010                    /s/  Joseph G. Scoville
                                        United States Magistrate Judge


## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). General objections do not suffice. *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).